

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

MAR – 4 2004

DAVID J. MALAND, CLERK
BY
DEPUTY _____

|  |  |  |
|---|---|---|
| GREGORY LYNN SUMMERS, | § | |
| | § | |
| Petitioner, | § | Civil Action No. 6:01cv139 |
| vs. | § | |
| | § | |
| DOUG DRETKE, Director, Texas | § | |
| Department of Criminal Justice, | | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM  OPINION

Petitioner Gregory Lynn Summers ("Summers"), an inmate in the custody of the Texas

Department of Criminal Justice, Institutional Division, filed an application for a writ of *habeas*

*corpus* pursuant to 28 U.S.C. §2254.  Summers challenged his capital murder conviction and

death sentence imposed in the 16th Judicial District Court of Denton County, Texas, on August

30, 1991, in cause No. F-91-671-A, styled *The State of Texas vs. Gregory Lynn Summers.*

Summers' application contains ten claims for relief.  Respondent Doug Dretke ("the

Director") moved for summary judgment on all ten of Summers' claims.  For the reasons set

forth below, the Court will grant the Director's motion and deny Summers' application.

1

### Statement of the case [1]

Max Aguirre was visiting Andrew Cantu at his home on the evening of June 10, 1990, and was introduced to Summers, who was also visiting Cantu. Aguirre said that Summers and Cantu spoke outside the house, and when they returned, Cantu told him that he had a job to do – kill three old people. Cantu said that the people were Summers' parents and asked Aguirre if he wanted to help. Aguirre declined.

The next day, Aguirre was riding in a car with his cousin Raymond Gonzales, Andrew Cantu and Paul Flores. Cantu asked the other three if they would help him "waste" three people whose adopted son wanted them killed because they were trying to take his kids. Cantu said that he would be paid with money that was in the victim's house and from insurance proceeds collected later. The three refused, and Cantu then asked if they would join him in the burglary of a house. Aguirre again declined, but Flores and Gonzales agreed.

Around midnight on June 11, 1990, Abilene firefighters discovered the bodies of Mandell Eugene "Gene" Summers, his wife Helen Summers, and his brother Billy Mack Summers in a burning house. The three had been fatally stabbed. Both the crime and the victim's identities were reported in the local news. On June 15, 1990, Keenan Wilcox contacted Abilene police and told them that Summers had once tried to hire him to murder his parents and uncle and to set their house on fire. Keenan said that Summers offered to pay him from insurance proceeds and from money in the house. On June 19, 1990, Joe Cantu made a statement to police implicating his brother Andrew in the crime.

---

[1] These facts were taken from the Texas Court of Criminal Appeals' opinion in *Summers v. State,* Nos. 71,338 and 71,389 (Tex. Crim. App. 1984).

A few weeks after the crime, Aguirre ran into Andrew Cantu at a dance and asked him if he had committed the murders; Cantu responded that he had. Aguirre asked him if he had been paid, and Cantu responded that he had not and was angry.

Andrew Cantu was convicted of capital murder for his part in the crime and sentenced to death, and on February 16, 1999, he was executed. Based upon *inter alia* the testimony of Aguirre, Flores and Gonzales, Summers was found guilty of hiring Cantu to kill his mother and father and he was also sentenced to death.

### *Procedural history*

On August 16, 1990, a Taylor County grand jury indicted Summers on four counts of capital murder. In count one, the indictment alleged that Summers employed Andrew Cantu to kill Helen Summers. In count two, the indictment alleged that Summers himself killed Helen Summers in order to inherit from her estate. In count three, the indictment alleged that Summers himself committed the murder of three people during the same criminal transaction, and in count four, the indictment alleged that Summers himself killed Helen Summers in the course of committing burglary. On June 18, 1991 the honorable Jorge A. Solis, presiding judge of the 350th District Court of Taylor County, changed the venue of the case to the 16th District Court of Denton County, and set the trial for July 29, 1991.

At trial, the jury was instructed only on the first, third and fourth counts of the indictment, and was instructed that as to counts three and four, it could find Summers guilty only if it found beyond a reasonable doubt both that Cantu had committed the acts charged and that Summers had solicited, encouraged, directed, aided or attempted to aid Cantu in committing those acts. On

3

August 21, 1991 the jury found Summers guilty of capital murder, although it did not specify

upon which count or counts of the indictment its conviction was based. On August 23, 1991,

after a punishment hearing, the jury answered in the affirmative the two special issues required

under Tex. Code Crim. P. Art. 37.071 (b).[2]  On August 30, 1991, the trial court entered

judgment sentencing Summers to death.

On June 8, 1994, in an unpublished opinion, the Texas Court of Criminal Appeals

affirmed Summers' conviction and sentence, and on January 10, 1996, it denied his petition for

rehearing.  On October 7, 1996, the Supreme Court of the United States denied Summers'

petition for a writ of *certiorari*.

On October 1, 1997, Summers filed an application for State post-conviction relief, which

was denied by the Texas Court of Criminal Appeals on March 29, 2001.  On April 4, 2001,

Summers filed an application for *habeas corpus* in this Court.  He filed an amended application

on November 15, 2001, and on April 8, 2002 the Director answered the application and moved

for summary judgment.

### Standard of Review

28 U.S.C. §2254 provides in relevant part that an application for a writ of *habeas corpus*

on behalf of a person in custody pursuant to the judgment of a state court shall not be granted

with respect to any claim that was adjudicated on the merits in state court proceedings unless the

adjudication of that claim resulted in a decision which was contrary to, or involved an

---

[2] The two special issues were:
(1) Whether the defendant acted deliberately and with the reasonable expectation that death of the deceased or another would result, and
(2) Whether there was a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

unreasonable interpretation of, clearly established federal law, as determined by the Supreme

Court of the United States, or was based upon an unreasonable determination of the facts in light

of the evidence presented in the state court proceeding.   In addition, the statute provides that a

state court's determination of a factual issue is presumed correct, and can only be rebutted by

clear and convincing evidence.[3]  Factual issues not determined by the state court are decided *de*

*novo*.  Summary judgment is appropriate if a claim is not cognizable in *habeas corpus*,[4] or if the

applicant cannot establish at least a genuine issue as to each element of a cognizable  claim.[5]

### *Analysis of Claims*

Summers' ten claims for relief were:

1. He is actually innocent.

2. He was denied his rights under the confrontation clause by the trial court's admitting and excluding certain out of court statements made by Andrew Cantu.

3. He was denied his rights under the Fourth, Fifth and Sixth Amendments and his right to the due process of law by the trial court's admitting testimony by an inmate-informant, William Spaulding.

4. He was denied his right to the due process of law by the State's failure to disclose exculpatory evidence.

5. He was denied his rights to a fair trial and to the due process of law because the jury instructions in his trial were flawed.

---

[3] In the present case, Summers contends that the State court's post-conviction proceedings in his case were insufficient to constitute an "adjudication" as the term is used in 28 U.S.C. §2254, and accordingly, this Court should review all of his claims *de novo*, rather than under the deferential standard of review set forth in the statute.  Summers' contention is foreclosed by *Valdez v. Johnson*, 274 F.3d 941, 946-47 (5th Cir. 2001), *cert. denied*, 123 S.Ct. 106 (2002).  In *Valdez*, the Fifth Circuit held that  the term "adjudication on the merits" as used in 28 U.S.C. §2254 referred to the decision of the State court, not the process employed by the State court to reach its decision. Accordingly, regardless of how the State reached its decision, the decision itself must be reviewed under the standards provided in the statute.

[4] *See McBride v. Sharpe*, 25 F.3d 962 (11th Cir), *cert. denied*, 513 U.S. 990 (1994).

[5] *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986).

6. He was denied his right to a fair trial and to the due process of law by the prosecution's presenting materially false expert psychiatric testimony.

7. He was denied his rights to a fair trial and to the due process of law when the trial court granted one of the prosecution's challenges for cause, and he was denied the right to equal protection of the law when the prosecution exercised one of its peremptory challenges in a racially discriminatory manner.
8. He was denied his right to the effective assistance of counsel.

9. He was denied his rights to the due process of law and to be free from cruel and unusual punishment because the evidence admitted at his trial was insufficient to support his conviction and sentence.

10. The Texas death penalty scheme is unconstitutional.

   *Actual Innocence Claim*

Summers' first claim is that he is actually innocent of the crime of capital murder, because Cantu acted alone in killing the victims and burglarizing the house.   Under Texas law, a claim of actual innocence constitutes grounds for post-conviction relief.  *Ex Parte Franklin*, 72 S.W.3d 671, 678 (Tex. Crim. App. 2002).  Under federal law, however, if the executive branch of a state has the power to pardon inmates, claims of actual innocence are not cognizable in *habeas corpus.  See Herrera v. Collins,* 506 U.S. 390, 400 (1993).  Because the Texas Board of Pardons and paroles has the authority to pardon condemned inmates, an inmate condemned to death by a Texas State court may not obtain relief from the federal courts based upon a claim of actual innocence. *Id.*

In the present case, the Texas Court of Criminal Appeals, applying Texas law, reached the merits of Summers' actual innocence claim.  Its findings of fact and conclusions of law on that claim are irrelevant, however, because this Court applies federal law.  Because federal law forecloses relief on actual innocence claims for inmates convicted under Texas law, the Court will grant the Director's motion for summary judgment as to Summers' first claim.

6

*Confrontation Clause Claim*

Summers' second claim is that the trial court's admission of certain out of court statements made by Andrew Cantu and exclusion of other statements by Cantu violated his rights under the Confrontation Clause.  The Clause, located in the Sixth Amendment to the Constitution of the United States and made applicable to the States through the Fourteenth Amendment, provides in part that "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  The Confrontation clause generally prohibits the admission of hearsay, which is defined as out of court statements offered as evidence of the truth of the matter asserted therein, if the person who made the statements is not available for cross-examination.  Such statements can only be admitted if they either fall within a firmly rooted hearsay exception or if the party offering the evidence makes a showing of particularized guarantees of trustworthiness of the statement.  *Ohio v. Roberts*, 448 U.S. 56, 66 (1980).  One firmly rooted exception to the hearsay rule is a statement made by a co-conspirator of a party during the course of, and in furtherance of, the conspiracy.  *United States v. Bourjaily*, 483 U.S. 171, 183 (1987) When the prosecution asked Aguirre, Flores and Gonzales what Andrew Cantu said to them while the three of them were riding in the car, the defense objected on the grounds that the statements were hearsay, and the trial court ruled the statements admissible under the co-conspirator exception.

In Summers's state post-conviction proceedings, the State court held that the statements were properly admitted under Texas R. Evid. 802 (e)(2)(E).  Because that court did not did not decide Summers' Confrontation Clause claim, the Court reviews it *de novo.*

Summers contends that the trial court erred in three ways.  First, he contends that the trial

court would have had to conduct a hearing and determine both that a conspiracy between Summers and Cantu in fact existed and that Cantu's out of court statements were made in the course of and in furtherance of this conspiracy.[6] In the present case, the defense asked the trial court to hold a hearing to determine whether substantial independent evidence existed of a conspiracy between Summers and Andrew Cantu. The trial judge, however, refused.

In *United States v. Fragoso*, 978 F.2d 896, 900-01 (5th Cir. 1992), *cert. denied*, 507 U.S. 1012 (1993), the Fifth Circuit held both that a formal hearing on this issue is not required. It also held that the trial court's failing to make specific findings that a conspiracy existed and that the out of court statements made by the alleged co-conspirator were within the course of, and in furtherance of, a conspiracy, although erroneous, was harmless error, because the trial court denied a motion for a directed verdict of acquittal at the close of the prosecution's case. *Id.* In the present case, the trial court denied Summers' motion for directed verdict at the close of the State's case. Tr. Vol. XV, p. 1042. Accordingly, the trial court's denial of Summer's request to hold a hearing was not error, and its failure to make specific findings is only harmless error.

Second, Summers contends that there was in fact insufficient independent evidence of a conspiracy to meet the requirements of the co-conspirator hearsay exception. He argues that the only evidence of a conspiracy between himself and Andrew Cantu were the statements made by Cantu, and he contends that the statements of an alleged coconspirator, standing alone, cannot constitute sufficient evidence of a conspiracy to render themselves admissible.[7] In reviewing the

---

[6] This is known as a *James* hearing. *See United States v. James*, 590 U.S. 575 (5th Cir. 1979).

[7] While several federal circuits have held what Summers contends, the Supreme Court of the United States expressly refused to decide whether the existence of a conspiracy can be established solely by the very out of court statements which are sought to be admitted under that rule, *see Bourjaily*, 483 U.S. at 181 n. 8, and the Fifth Circuit has not addressed the issue.

record, however, the Court finds that independent evidence of the existence of a conspiracy between Summers and Cantu was admitted. For example, William Spaulding, the jailhouse informant, testified that Summers confessed the conspiracy to him. Accordingly, the Court finds that the trial court's admitting the statements made by Andrew Cantu did not violate Summers' rights under the Confrontation clause.

Third, Summers contends that the trial court denied him his rights under the Confrontation Clause when it refused to allow him to introduce evidence of a statement by Cantu that there was a "contract" out on Summer's life. Summers contends that this statement was relevant to the issue of Cantu's credibility, because it tended to show that Cantu was biased against him. The State court denied this sub-claim based upon State evidence law. Because that court did not decide this claim under the Confrontation Clause, this Court will do so *de novo*.

Summers relies on *Smith v. Fairman*, 862 F.2d 630, 637 (6th Cir. 1988), in which the United States Court of Appeals for the Sixth Circuit held that when a witness is unavailable for cross-examination, defendants cannot be prevented by the hearsay rules from introducing evidence relevant to the issue of the witness' credibility, such as inconsistent prior statements, or bias by the witness against the defendant. Summers is correct that Cantu's statement was relevant to whether he was biased against Summers, but the problem is that this statement was made in December, 1990, some six months *after* the murders were committed, so its relevance to the issue of whether Cantu was biased against Summers in June, 1990, when Cantu made his inculpatory statements, is questionable.

More importantly, even if the trial court's exclusion of Cantu's December, 1990 statement violated Summers' rights under the Confrontation Clause, the Court would refuse to

9

grant relief because it would find that the trial court's error was harmless.  To be considered harmful, an erroneous exclusion of evidence must have had a substantial and injurious effect or influence in determining the jury's verdict.  *See Brecht v. Abrahamson*, 507 U.S. 619, 636-38 (1993).  When considered in light of Cantu's statement in June 1990 that he was angry that he had not been paid, the most reasonable interpretation Cantu's December 1990 statement that a contract was out on Summers' life was that Cantu wanted Summers killed because he never received any money from Summers for committing the killings.  The Court finds that it is not even reasonably likely that the determination of the jury's verdict was substantially and injuriously affected or influenced by not hearing Cantu's December 1990 statement.  Accordingly, any error by the trial court in not admitting this testimony was harmless.

In summary, because the trial court's failure to conduct a hearing and its admission of Cantu's inculpatory statements did not violate Summers' rights under the Confrontation Clause, and because the trial court's exclusion of evidence of Cantu's animosity toward Summers was, at worst, harmless error, the Court will grant the Director's motion for summary judgment as to Summers' second claim.

### Jailhouse Informant Testimony Claim

Summers' third claim is that the trial court's allowing jail house informant William Spaulding to testify to his conversations with Summers violated Summers' Constitutional rights in three ways.  First, he contends that because he exercised his rights under the Fifth Amendment not to answer questions by the authorities while he was in custody, the State's use of Spaulding to elicit a confession from him violated that right.  Second, he contends that the prosecution's not disclosing to the defense a.) that Spaulding was acting at the behest of the State when he spoke

10

with Summers, and b.) that Spaulding's testimony was, in part, coerced by threats and promises by the district attorney, violated his right to a fair trial and to the due process of law. Third, he contends that he was denied the due process of law because Spaulding's testimony as to what Summers said was false, and the prosecution introduced the evidence at trial despite knowing that it was.

The State court denied this claim on the merits, based upon its factual determination that Summers' admission to Spaulding was made before Spaulding contacted the authorities, rather than after, so Spaulding never acted as an agent of the State. The State court reasoned that, because Spaulding never acted as an agent of the State, the State never questioned Summers while he was in custody. The State court also reasoned that, because Spaulding did not act as an agent of the State, and because his testimony was not coerced, the prosecution did not suppress exculpatory evidence to that effect. Finally, the State Court found that Spaulding's trial testimony about Summers' admissions to him, and his testimony that no promises were made to him in exchange for his testimony, was truthful.

Because the State court decided this claim on the merits, and because the parties agree on the applicable federal law, Summers can prevail on this claim only by establishing that the facts found by the State court were unreasonable in light of the evidence presented at the State court hearing. *See* 28 U.S.C. §2254 (d)(2). At trial, Spaulding testified that he had talked with Summers on several occasions about his case in December of 1990, and that during those discussions, Summers told him that he had hired a person to kill his father, although he did not intend to have his mother and uncle killed as well. Spaulding testified that about four weeks before the trial, Summers asked him to type out a document for him, and he did so, but that after

11

concluding that Summers was creating false evidence, he contacted the District Attorney's office. Spaulding testified that there were no deals made with or promises made to him by the prosecution in exchange for his testimony.

In his State post-conviction proceedings, Summers produced an affidavit from Spaulding in which Spaulding stated that he had once typed a document for Summers and, upon learning shortly before Summers' trial that Summers intended to use that document as false evidence in his case, contacted the Jail Administrator. A detective then visited Spaulding and asked him if he would be willing to talk with Summers about the case while carrying a tape recorder, to which Spaulding agreed, although, when the meeting actually took place, Spaulding did not receive a tape recorder. Spaulding said that he then met with Summers, who initially told him that he was at the scene of the murders and had asked Cantu for help, but then told him that he had not been involved; instead, Cantu had drawn him (Summers) into the crime because he (Cantu) had done work for Summer's father but had not been paid. Spaulding then relayed this information to the detective, who told Spaulding that unless he testified only to Summer's admission of guilt, not his later recantation, (the District Attorney) would charge him with fabricating evidence for Mr. Summers. Spaulding said that he testified as instructed, and shortly thereafter he received several "free world" meals and was assured that the District Attorney's office would write a favorable letter on his behalf to the Texas Board of Pardons and Paroles, and that in fact, a favorable letter was later written and sent.[8]

---

[8] Summers contended in his application that a detective promised Spaulding that the District Attorney would write a favorable letter to the Parole Board if Spaulding assisted the State by providing untrue testimony. Spaulding's affidavit, however, states that it was after he testified that he received assurance that a letter would be sent, rather than before.

Because after-trial recantations by witnesses are viewed with extreme suspicion, *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991), *cert. denied*, 502 U.S. 1112 (1992), a recantation, in the absence of persuasive corroborating evidence, can never render a finding based upon trial testimony unreasonable. In the present case, Summers has not produced any evidence whatsoever, much less persuasive corroborating evidence, that Spaulding's trial testimony was false and his affidavit testimony was true. Because Summers has not established that the trial court's determination that Spaulding's trial testimony was true was unreasonable, the Court will grant the Director's motion for summary judgment as to Summers' third claim.

### *Brady* Claim

Summers' fourth claim is that the prosecution suppressed evidence relevant to the credibility of witnesses Spaulding, Keenan Wilcox and Darrell Shirlls. In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court of the United States held that the knowing failure to disclose material exculpatory evidence is grounds for reversing a conviction, regardless of whether the prosecutor believed in good faith that the evidence did not have to be disclosed. Exculpatory evidence includes evidence which impeaches the credibility of a prosecution witness, *see Giglio v. United States,* 405 U.S. 150 (1972), and evidence is material if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *Kyles v. Whitley,* 514 U.S. 419, 433 (1995).

### *a. William Spaulding*

Regarding witness Spaulding, Summers contends that the prosecution knowingly suppressed the fact that a detective threatened to charge him with fabricating evidence unless he testified only to Summers' admission of guilt, rather than testifying to both Summers' admission

13

and his later denial. The Court agrees that, were such a threat made, the prosecution would have been obliged to disclose it. The State court denied this sub-claim on the merits, and because the parties agree as to the applicable federal law, the standard of review is whether the State court's rejection of this claim was based upon an unreasonable determination of the facts in light of the evidence presented at the hearing. *See* 28 U.S.C. §2254 (d)(2).

The State court resolved the conflict between Spaulding's trial testimony and his later affidavit in favor of his trial testimony, finding that no such threat was made. As stated above, after trial recantations are viewed with extreme suspicion, and Summers has not provided any new evidence to suggest that the State court's determination that Spaulding's denial at trial that any threats were brought to bear upon him was true, and that his later statement in his affidavit that such a threat was made was false, was unreasonable. As to witness Spaulding, the Court finds no *Brady* violation, so it will grant summary judgment as to this sub-claim.

Summers also contends that the prosecution suppressed evidence that Spaulding had been disciplined in prison for forging a document. The State court did not decide this sub-claim, so the Court will determine it *de novo*. The Court notes that on cross-examination, Spaulding admitted to prior convictions for forgery and issuing a worthless check. See Transcript Vol. 12 pp. 237-40. In light of these admissions, the evidence of a disciplinary infraction involving forgery would have been merely cumulative, so the Court finds that there is not a reasonable probability that, had Spaulding's disciplinary violation been disclosed to the defense, the result in either the guilt or punishment phases of his trial would have been different. Because Summers cannot establish that this evidence would have been material as that term is defined in *Brady*, the Court will grant the Director's motion for summary judgment as to this sub-claim.

14

*b. Keenan Wilcox*

Regarding witness Wilcox, Summers first contends that the prosecution suppressed the fact that he had sought and received a reward from Crimestoppers for reporting that Summers had recently asked him to kill Summers' parents and uncle. A witness' interest in obtaining a reward is considered exculpatory, so it must be disclosed. *See Kyles v. Whitley,* 514 U.S. 419, 442 n.13 (1995). At trial, Wilcox testified that he did not expect to receive a reward, and said that he had not told anyone else that he expected to receive a reward. Summers' counsel, however, stated in an affidavit that Wilcox told her in 1997 that he sought a $1000 reward from Crimestoppers, and was paid a reward, although it was less than that amount.

The State court rejected this claim on the merits, so the standard of review for this Court is whether that rejection was contrary to, or resulted from an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. The State court based its denial on a finding that there was insufficient evidence to support a finding that Wilcox sought and received a reward for his testimony. Strictly speaking, this is not a finding of fact - the fact issue is whether Wilcox sought and received a reward, not whether the evidence that he did so was sufficient or insufficient. Because the State Court did not make a true factual finding on this issue, this Court must determine the facts *de novo.*

In making this determination, the Court notes first that, as stated on page 11, recantations by a witness are viewed with extreme suspicion. *See Chambers,* 944 F.2d at 1264. In addition, although the authority on this point is not unanimous, the general rule is that an affidavit that simply recants previous testimony which was given under oath does not create an issue of fact sufficiently genuine to defeat a motion for summary judgment. *See e.g. Bank of Illinois v. Allied*

15

*Signal Safety Restraint Systems,* 75 F.3d 1162, 1168 (7th Cir. 1996). This rule is known as the "sham affidavit" rule. The policies which underlie the sham affidavit rule in general civil cases - avoiding prolonged litigation and fostering respect for swearing under oath - apply with even greater force in cases such as this one, when an individual's life or liberty is at stake at the time the oath is originally taken, and when litigation has already proceeded through trial and appeal. In post-conviction proceedings, Courts must take into account the value of preserving the finality of judgments. *See Jackson v. Johnson*, 217 F.3d 260, 262 (5th Cir. 2000). Accordingly, the Court holds that a recantation by a trial witness must be persuasively corroborated in order to defeat a motion for summary judgment in a *habeas corpus* case. In the present case, Summers has offered no corroborating evidence, much less persuasive corroborating evidence, that witness Wilcox sought and received a reward for his testimony. Accordingly, the Court finds that Summers has failed to create a genuine issue of fact as to this issue. Because Summers has failed to establish a fact issue as to the existence of exculpatory evidence, the Court finds that the State court's rejection of this claim was neither directly contrary to, nor the result of an unreasonable application of, clearly established federal law as determined by the United states Supreme Court in *Kyles v. Whitney*. The Court a will grant the Director's motion for summary judgment as to this sub-claim.

Summers' second sub-claim regarding witness Wilcox is that the prosecution suppressed the fact that at the time of his trial, Wilcox was a drug addict and also sold drugs. Summers argues that Wilcox' drug use and dealing were exculpatory because they reflected poorly on his credibility, and thus this information had to be disclosed to the defense. The State Court did not decide this sub-claim, so the Court will determine it *de novo*.

In determining this sub-claim, the Court notes that Summers' contentions are not completely consistent with the record. At Summers' trial, Wilcox testified that he used illegal drugs in 1989, but that by the time of the trial (1990), he no longer had that problem. Wilcox also in effect "testified" that in 1989 he dealt drugs, since he testified that he sold them to Summers shortly before the killings were committed. Wilcox was not asked at trial whether he still sold drugs. In 1997, Wilcox told Summers' counsel that he had used and sold "crank" (methamphetamine), but did not specify when he did so or when, or if, he stopped. Based upon Wilcox' trial testimony and Summers' counsel's affidavit, the Court cannot find that the prosecution suppressed the fact that Wilcox was a drug dealer and user at the time of Summers' trial; the record establishes only that Summers used and dealt drugs at some time which included 1989.

Assuming that the prosecution did fail to disclose these facts about Wilcox, the Court notes that Wilcox nevertheless admitted at trial that in 1989 he both used and dealt drugs. Because the jury learned these facts at trial, the Court finds that there is not a reasonable probability that, had this evidence been disclosed to the defense before trial, the result in either the guilt or the punishment phases of Summers' trial would have been different. Accordingly, this evidence is not material as that term is defined in *Brady*. Because Summers cannot establish either that Wilcox in fact used and dealt drugs at the time of his trial, or that if he did, that these facts would have been material as that term is defined in *Brady*, the Court will grant the Director's motion for summary judgment as to this sub-claim.[9]

---

[9] The Court also notes that because Wilcox testified that he was high when he sold drugs to Summers, Summers likely had independent knowledge of Wilcox' drug use and activities. In such circumstances, the failure to disclose this evidence constitutes harmless error. *See Williams v Brown,* 609 F.2d 216, 221 (5th Cir. 1980).

17

Summers' final sub-claim about witness Wilcox is that although the authorities knew that he was a drug dealer, he was never arrested. Summers contends that this is exculpatory because it suggests that an explicit deal was made or an implicit understanding existed that Wilcox would receive favorable treatment in providing information or testimony.

The State Court denied this claim on the merits, so the applicable standard of review is whether the denial was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. See 28 U.S.C. §2254 (d)(1). The State court's denial was based upon its finding that the evidence offered by Summers at the State post-conviction hearing was insufficient to establish by clear and convincing evidence that Wilcox received a deal regarding any possible charges to which he was subject to prosecution. Because this was not, strictly speaking, a finding of fact, and because it relies on an incorrect legal standard, the Court will determine the material facts *de novo,* and then determine whether, in light of those facts, the State court's denial of this sub-claim was reasonable.

In reviewing the record, the Court notes that the evidence upon which Summers relies falls short of establishing a fact issue as to the existence of any explicit deal or implicit understanding that Wilcox would not be prosecuted for his drug related activities in exchange for providing information or for testifying at Summers' trial. At trial, Wilcox was asked at trial if he "made any kind of deal or anything to give your statement " and he answered, "No, sir." In 1997, Wilcox told Summers' counsel that he had been "treated very well by the District Attorney's office," and said he meant by that that he had not been charged with any drug offenses, despite knowledge of his activities by the "Special Task Force." To interpret this

18

statement as inconsistent with Wilcox's trial testimony, the Court must assume two facts not alleged: that before Wilcox  went to the police in 1989 with his story about Summers, the "Special Task Force" knew about his drug activities, and, at that time he was either told, or led to believe, that he would not be prosecuted for those activities in exchange for providing either information or testimony.   Absent these two allegations, the Court cannot find that the statements Wilcox made to Summers' counsel in 1997 contradict Wilcox' 1990 trial testimony that he was not offered any "deals or anything" to give his statement.

Wilcox's affidavit does not create a fact issue as to whether Wilcox was promised or led to believe that he would receive favorable treatment by the prosecution in exchange for providing either information or testimony.  Because in this instance Summers cannot establish a fact issue that exculpatory evidence existed, the Court finds that the State court's rejection of this sub-claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court in *Brady*.  The Court will grant the Director's motion for summary judgment as to this sub-claim.

### c. Daryl Shirlls

At the punishment phase of the trial, the State introduced four types of evidence relevant to the issue of whether there was a probability that Summers would commit acts of criminal violence that would constitute a continuing threat to society: the facts of the crime itself, previous acts of violence by Summers towards his wife and an earlier girlfriend, expert psychiatric opinion testimony that Summers was likely to be dangerous in the future, and the testimony of Shirlls that Summers told him he would kill a particular witness if the witness testified adversely to him.  At the time of the trial, Shirlls had been indicted on more than a dozen felony charges in six

19

counties, including rape and attempted capital murder.  The prosecution, however, disclosed to the defense only a single indictment for aggravated robbery in Denton County.  On direct examination, the prosecution asked Shirlls whether he was facing aggravated robbery charges in Denton County, and Shirlls truthfully answered that he was.  The prosecution stressed Shirlls' testimony about Summers' threat in its closing statement.

Summers claims that the prosecution's failure to disclose the other indictments that were pending against Shirlls denied him a fair trial.[10]  To recover on this claim, Summers must establish that the prosecution failed to disclose exculpatory, material evidence. The State court denied this claim on the merits, so the standard of review is whether the denial is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

The State court based its denial of this sub-claim on a factual finding that "the State did not fail to give Applicant exculpatory or mitigating evidence relating to Darrell Shirlls." 28 U.S.C. §2254 (e)(1) directs this Court to accept that finding unless Summers rebuts it by clear and convincing evidence.  Because it was undisputed that the prosecution failed to disclose the other indictments to the defense, the State court's conclusion must have been based on the proposition that the evidence of other indictments pending against Shirlls was not exculpatory. Summers contends that the other indictments were exculpatory in that they bore on Shirlls' credibility, since  he would have had an incentive to fabricate testimony damaging to Summers in

---

[10] Summers stated on page 68 of his application that Shirlls suffered from mental illness.  While this fact might have been used to impeach his testimony, and thus be considered exculpatory, Summers never contends that the State knew, and therefore knowingly failed to disclose, this fact to defense counsel before trial.  The Court accordingly addresses only the pending indictments issue.

the hope that he would receive leniency in sentencing on those other charges.[11]   Because the Court agrees with Summers that the evidence of other indictments against Shirlls is exculpatory, the Court rejects the State Court's factual finding and finds instead that Summers has established that the prosecution knowingly suppressed exculpatory evidence.

The  remaining issue on this claim is whether the evidence was material, in other words, was there a reasonable probability that, had the evidence been disclosed before trial, the result in the punishment phase of Summers' trial would have been different.  The State court addressed this issue in its conclusions of law, stating: "[The] [a]pplicant fails to show by clear and convincing evidence how the extent of Mr. Shirlls' pending charges undermines confidence in his testimony or in the verdict, particularly when the jury was aware that Mr. Shirlls was in jail on pending aggravated robbery charges . . ."  The State court's use of the terms "undermines confidence in the verdict" shows that it applied the correct legal standard for determining materiality, but its application of the "clear and convincing evidence" burden of proof was incorrect; the appropriate burden of proof for this issue is "preponderance of the evidence."  *See Weeks v. Jones*, 26 F.3d 1030, 1047 (11th Cir. 1994), *cert. denied,* 513 U.S. 1193 (1995).  The Court must determine, despite the State court's incorrect reasoning, whether its conclusion - that the evidence of other pending indictments against Shirlls was not material - was reasonable in light of the other evidence presented to the jury.  *See Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc.*)

_____

[11] While there is no evidence that any deal or understanding existed, Shirlls did eventually receive leniency:  The sentences in all of his cases ran concurrently

The Director contends that the State court's determination - that the evidence would not have been material - was reasonable, for two reasons.  First, she contends that even if the prosecutors had disclosed Shirlls' other pending indictments to the defense, the jury would not have heard about them because that evidence would not have been admitted by the trial court. This argument is supported by *Dowthitt v. Johnson*, 230 F.2d 252, 256 (5th Cir. 2000).  In that case, on indistinguishable facts, the Fifth Circuit held that "[u]nder Texas law, the existence of the indictment becomes admissible only if the witness, on direct examination, [either] misrepresents himself as having no trouble with the law . . . [or there is] a relationship between [the] prosecution and [the witness'] case."  The Fifth Circuit reasoned that because neither of those two exceptions were applicable in that case, the trial court would not have admitted the evidence, so the jury would not have heard it.  As a matter of logic, inadmissible evidence can never be material, as that term is defined in *Brady*.

The Director correctly points out that neither of the evidentiary exceptions is present in this case either, and indeed, Summers himself does not contend that he can establish either exception to the rule.  Regarding the first exception, Shirlls did not misrepresent himself as having no trouble with the law; he answered truthfully the prosecution's question whether there was an indictment for aggravated robbery pending against him in Denton County.  Of course, by asking such a limited question on direct examination the *prosecution* misrepresented to the jury *the extent* of Shirlls' trouble with the law, but because Shirlls himself was under no obligation beyond answering truthfully the questions put to him, the Court agrees that Shirlls did not misrepresent himself as having no trouble with the law.  Regarding the second exception, while the punishment Shirlls eventually received was considerably less than it could have been, there is

22

no evidence of a relationship between the prosecution and Shirlls' other indictments.

Summers does not address the *Dowthitt* case in his application, relying instead on several Fifth Circuit cases that held that there is a constitutional right to introduce evidence of pending charges against a witness, including *United States v. Landerman*, 109 F.3d 1053 (5th Cir. 1997),*United States v. Alexius*, 76 F.3d 642 (5th Cir. 1996); *United States v. Brown*, 546 F.2d 166 (5th Cir. 1977); and *Luna v. Beto*, 395 F.2d 35 (5th Cir.), *cert. denied*, 394 U.S. 966 (1968). In attempting to resolve the apparent inconsistency between these cases, the Court notes that both *Alexius* and *Brown* involved direct appeals of convictions obtained under federal law, not Texas law. Accordingly, the Texas rule of evidence upon which the Fifth Circuit relied in *Dowthitt* was not applicable. Similarly, although *Luna* was, like the present case, a *habeas corpus* case based upon a conviction under Texas law, at the time it was decided (1968) the Texas rules of evidence specifically allowed the introduction of pending charges against a witness; the rule was changed in 1985. Because the present case was tried in 1991, *Dowthitt* is the applicable precedent.

While the Fifth Circuit's reasoning in *Dowthitt,* was correct, the Court does not feel it appropriate to follow that opinion because the Texas rule of evidence upon which it relied is unconstitutional as applied to the present case. The Fifth Circuit in *Dowthitt* cited *Michelson v. United States*, 335 U.S. 469, 482 (1948) for the proposition that prior arrests are not generally admissible to impeach. In that case, however, the Supreme Court of the United States held only that in cross-examining a character witness for a defendant, the prosecution may not ask the witness whether he was aware that the *defendant* had been arrested in the past. The Court held that to do so would allow the prosecution to suggest improperly that because the defendant had been arrested before, he was more likely to have committed the crime for which he was on trial.

23

By contrast, a pending indictment against a witness himself is one of the precise exceptions to the general rule against admitting evidence of prior arrests, because it is highly relevant to the witness' own credibility; there is an inherent possibility that the witness will testify in favor of the State in the hope that he will receive leniency when his case is finally decided. *See Alford v. United States*, 282 U.S.687, 693 (1931).  The Court in *Alford* held that denying the defendant the opportunity to cross-examine a witness about the fact that charges were pending against him  was a violation of the defendant's constitutional rights under the Confrontation Clause of the Sixth Amendment.

The Texas rule of evidence at issue in this case is too narrow to satisfy the requirements of the Confrontation Clause. By limiting the introduction of evidence of pending indictments to circumstances when the witness himself misrepresents to the jury on direct examination that he is not facing any pending charges at all, the rule allows the prosecution to ask the defendant if he is facing a particular charge - which the defendant can truthfully answer in the affirmative, and by asking no further questions hide from the jury any other charges pending against the witness, because the defendant did not misrepresent that he was in no trouble whatsoever with the law. This is precisely what occurred in this case.[12]  Because the Court accepts as axiomatic that the motivation for a witness to slant or fabricate testimony in order to curry favor with the prosecution increases as the extent of the punishment for which he is eligible increases, and because the Texas rule of evidence provides a clever prosecutor a way to thwart the jury from learning the full extent of the legal trouble the witness may be facing, the Texas rule of evidence

---

[12] Indeed, as written, the rule allows the prosecution to avoid all mention of the subject by simply  not asking the defendant any questions at all about pending charges on direct examination; if not asked, a defendant could not be said to have, himself, misrepresented anything.

is unconstitutional, at least when, as here, the prosecution takes advantage of the narrow wording of the rule to achieve that result.

The Fifth Circuit in *Dowthitt* reasoned correctly that there cannot be a reasonable probability of the jury reaching a different verdict based upon undisclosed evidence if the rules of evidence would have precluded the jury from hearing that evidence.  When the evidentiary rule which would have barred the admission of the evidence violates the defendant's rights under the Confrontation Clause, however, the defendant must be permitted to introduce extrinsic impeachment evidence such as pending indictments.  *See Ellsworth v. Warden, New Hampshire State Prison,* 318 F.3d 285, 2003 WL 203467 (1st Cir. 2003).  The Court therefore declines to follow *Dowthitt,* and will instead resolve the materiality issue by considering what the probable effect of the evidence would have been on the jury's verdict had it been admitted.

The Director contends that even were the evidence of Shirlls' pending indictments admitted, there is not a reasonable probability that the result in the punishment phase of Summers' trial would have been different, because the evidence supporting the finding that Summers would be dangerous in the future was overwhelming, and the mitigating effect of further impeaching Shirlls would have been too slight to have offset that evidence.

The prosecution introduced four types of evidence at the punishment phase.  First, it relied on the facts of the case itself.  While the actions of the actual murderer, Cantu, are not particularly relevant to the issue of Summers' future dangerousness, Summers' own acts - contracting for the murder of his own family members in order to hasten receiving an inheritance - is more suggestive of future dangerousness than, for example, a crime of passion.  Summers' calculated disregard of familial bonds suggests that he has little respect for the norms of societal

25

conduct. Second, the prosecution introduced evidence of several acts of violence Summers

visited upon his wife and a former girlfriend, showing his disrespect for the bodily integrity and

safety of his loved ones even when not tempted by financial gain. Third, the prosecution

introduced expert psychiatric testimony that Summers was likely to be dangerous in the future.

Finally, the prosecution introduced Shirlls' testimony.

The evidence introduced at the punishment phase of Summers' trial which supported a

finding of future dangerousness was fairly strong. That Shirlls was facing a half-dozen serious

felony charges, rather than just one, would have hurt his credibility somewhat, but his motivation

to slant or fabricate testimony had already been revealed to the jury by his admission that he was

facing an aggravated robbery charge, and the fact that other felony charges were pending against

him would not have rendered his testimony inherently unworthy of belief. Further, even if the

jury chose to disregard Shirlls' testimony, the evidence supporting a finding of future

dangerousness was still strong. The Court finds that it would not have been unreasonable, based

upon the above evidence, for the State court to deny relief on this claim, on the grounds that there

was not a reasonable probability that, had the jury known of the extra charges facing Shirlls, the

result in the punishment phase of Summers trial would have been different. Accordingly, the

Court will grant the Director's motion for summary judgment as to this sub-claim.[13]

---

[13] This case is sufficiently similar to *Banks v. Dretke*, ___ U.S. ___, 2004 WL 330040 (2004), that a comparison is instructive. In that pre-A.E.D.P.A. case Farr, a witness who was a paid informant, testified during the punishment phase of Banks' trial that Banks was planning to commit other armed robberies. The prosecution did not disclose Farr's informant status to the defense. Because Farr was presented to the jury as unbiased, because the prosecution in that case did not introduce psychiatric testimony regarding Banks' future dangerousness, and because the only other evidence presented at the punishment phase was that Banks, who had no previous criminal record, had been involved in a fight (which the other combatant later admitted that Banks did not initiate) the Supreme Court of the United States found that, had Farr's status been disclosed, there was a reasonable probability that the result in the punishment phase of that case would have been different. In the present case, Shirlls' testimony was of roughly equal relevance to the future dangerousness issue, and whether his credibility would have suffered more than Farr's had the other charges he (Shirlls) was facing been disclosed to the jury is difficult to say. What distinguishes this case from *Banks is* the significantly greater strength of the non-tainted evidence of future dangerousness, and the deference that the A.E.D.P.A. mandates this Court provide the State court's determination of the materiality issue.

26

Because the Court will grant summary judgment as to each of the sub-claims in Summers' fourth claim, it will grant summary judgment as to the entire claim.

*Jury Instructions Claim*

### a. lack of opportunity to give effect to mitigating evidence

Summers contends that the jury instructions given in the punishment phase of his trial were defective in four respects. His first sub-claim is that the instructions were defective because they did not allow the jury to give mitigating effect to the evidence he offered, specifically, his non-violent nature, that he held a job and supported his girlfriend and her children, his Christian faith, his remorse for the deaths of the victims, and his adaptability to prison life. Because the State court denied this claim on the merits, the standard of review for this Court is whether the denial was directly contrary to, or resulted from an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. The State court based its denial on the premise that evidence of good character was not mitigating evidence. Because this premise is incorrect, this Court will determine the law and the facts *de novo* and then determine whether the State court's denial of the claim was reasonable in light of these determinations. *See Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc.*)

In *Penry v. Lynaugh*, 492 U.S. 302 (1989) ("*Penry I*"), the Supreme Court held that the Texas jury instructions on punishment did not allow the jury to give mitigating effect to evidence of mental retardation and childhood abuse. Mental retardation and childhood abuse constitute factors which could lead a juror to determine that an offender is more likely to be dangerous in the future, yet they are circumstances which are not the offender's fault and are

27

therefore both mitigating and aggravating. Because the Texas special issues ask the jury only whether there was a probability that an offender would be dangerous in the future, without asking whether there were any mitigating circumstances present which would lead a juror to conclude that it was appropriate to spare the offender's life even if he were likely to be dangerous in the future, the jury could give this type of evidence only aggravating effect. Accordingly, the jury instructions were unconstitutional when this type of evidence was offered as partial mitigation in a capital murder case.

The Fifth Circuit has held that the special sentencing issue jury instructions do allow the jury to give effect to evidence of good character, however, because a juror could determine, based upon such evidence, that there was not a probability that a defendant would commit acts of criminal violence which would constitute a continuing threat to society, and simply vote "no" as to that special issue. *See Boyd v. Johnson*, 167 F.3d 907, 912 (5th Cir. 1999), *citing Barnard v. Collins*, 958 F.2d 634, 640 (5th Cir. 1992). This Court agrees with the Fifth Circuit's reasoning in *Boyd* and *Barnard*, and accordingly holds that, in contrast to evidence of mental retardation and childhood abuse, the Texas jury instructions on punishment in capital cases do allow the jury to give mitigating effect to evidence of good character and adaptability to prison life. Because the State court's rejection of this claim was not an unreasonable application of the rule *Penry I*, the Court will grant the Director's motion for summary judgment as to this sub-claim.

### b. failure to inform jury of the effect of a "holdout" juror

Pursuant to TEX. CODE CRIM PRO. Art. 37.071, the jurors in Summers' case were informed that under in order for Summers to receive the death penalty the affirmative answers to the two special issues had to be unanimous, and in order for him to receive life imprisonment at

least ten of the twelve jurors had to answer one of the special issues in the negative. Pursuant to that same article, however, the jurors were *not* informed that if they unanimously answered one of the special issues in the affirmative and eleven jurors answered the other special issue in the affirmative and one juror answered the other special issue in the negative, the Court would still have sentenced Summers to life imprisonment. Summers' second sub-claim is that the statutory prohibition against informing the jurors of the effect of a lone holdout violated his rights to a fair and impartial jury, to the due process of law and to be free from cruel and unusual punishment.

The State court rejected this claim, concluding that: "The trial court was not required to tell the jury what the effect of a single 'no' answer would be; to the contrary, the trial court was not allowed to do so." Because this conclusion appears to be based upon State law, rather than federal law, the Court must determine this claim *de novo*.

In *Alexander v. Johnson,* 211 F.3d 895, 897-98 (5th Cir. 2000), the United States Court of Appeals for the Fifth Circuit held that a state court's rejection of this precise claim was not contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. This Court is bound by that precedent, so it will grant the Director's motion for summary judgment as to this sub-claim.

> *c. failure to inform the jury of the effect of its answers to the special issues*

Summers' third sub-claim is that by not expressly telling the jury the practical effect of "yes" and "no" answers to the two special issues, the punishment phase jury instructions diminished the jury's sense of responsibility for his fate. The Eighth Amendment to the United States Constitution requires that jurors know the import of their decisions so that they may exercise their discretion responsibly and reliably at the sentencing phase of a death penalty case.

29

*Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985). In determining whether the jurors did know the import of their answers to the special issues, a court considers the totality of the circumstances. *Hughes v. Johnson*, 191 F.3d 607, 618 (5th Cir. 1999), *cert. denied*, 528 U.S. 1145 (2000).

The State court rejected this claim, concluding that " the jury's sense of responsibility for the death sentence verdict was not undermined by the charge and instructions given to the jury. No juror was misled, misinformed, or subject to misconception about his or her responsibility for applicant's death sentence." This conclusion was based upon the factual finding that "the prosecutor informed the special venire as a whole, and informed each individual juror who decided [Summers'] fate, of the consequences of the effect of (sic) the answers to the special issues." Under 28 U.S.C. §2254 (e), the issue is whether the State court's rejection of this claim was based upon an unreasonable determination of the facts in light of the evidence presented.[14]

Summers does not contend that the State court's finding that the prosecutor told the jurors of the consequences of their answers during *voir dire* was incorrect. Instead, he contends that the State court's conclusion that "no juror were not misled, misinformed, or subject to misconception about his or her responsibility for [Summers] death sentence" was unreasonable in light of the punishment phase jury instructions which stated that the jurors "shall not consider, discuss or speculate upon [what] the effect of your answers to the [special] issues might be." application at 103. The Court would agree that, had the court given this instruction, it would have been unreasonable for the State court to rely solely on the prosecution's *voir dire* statements in

---

[14] Although not mentioned in the State court's findings and conclusions, the jurors were also told of the effect of their answers to the special issues by defense counsel at closing. *See* Tr. Vol XVII, p. 259.

determining, under a totality of the circumstances standard, that the jurors were aware of the

import of their answers to the special issues.  In reviewing the record, however, the Court finds

that, contrary to Summers' contentions, the punishment phase jury charge does not contain the

instruction he described.  Accordingly, the Court finds that the State court's rejection of this

claim was based upon a factual determination which was reasonable in light of the evidence

presented, so it will grant the motion for summary judgment as to this sub-claim.

### d. failure to adequately define terms in the jury instructions

Summers' final sub-claim is that four terms in the special sentencing issues were not

adequately defined: "deliberate," "probability," "criminal acts of violence"and "continuing threat

to society."

At the guilt innocence phase of the trial, the jurors determined that Summers intentionally

killed his parents and uncle; the first punishment special issue was whether he had deliberately

done so.  Summers contends that the jury charge at the penalty phase did not adequately

distinguish "deliberate" from "intentional," so the jurors might have applied the wrong legal

standard in answering the first special issue.[15]

The State court rejected this claim, finding that "[t]here is no likelihood that the jury

confused "deliberately" with "intentionally" when the jury was charged on both terms."  The

issue for the Court is whether the State court's rejection of the claim is directly contrary to, or an

unreasonable application of, clearly established federal law, as determined by the Supreme Court

---

[15] The charge stated: " You are instructed that the word "deliberately, used in special issue No. 1, has a meaning different and distinct from the word "intentionally," as that word was previously defined in the Court's charge on guilt. "Deliberately" is defined as something more than intentionally and something less than premeditation, or, a decision involving a thought process which embraces more than a mere will to engage in the conduct. A person acts "intentionally," or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result."

of the United States.  The Court finds that the State court's rejection of this claim was not unreasonable, because even if the definitions of the terms were inadequate, any error would have been harmless.  The defense never claimed that while Summers' hiring Cantu to kill his parents may have been intentional, it was not deliberate.  Thus, any confusion by the jury about the terms would not have had a substantial and injurious effect or influence  in determining their verdict at the punishment phase of the trial.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

Summers next contends that, as to the second special issue, the terms "probability," "criminal acts of violence" and "continuing threat to society" were also inadequately defined. The State court rejected this claim, finding that these terms "had common meanings understood in their ordinary usage by average jurors" and thus "do not require definition."  The issue for the Court is whether the State court's rejection of this claim was directly contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

The Court notes that there is no Supreme Court precedent holding that these terms are so imprecise as to be unconstitutionally vague; indeed, in *Jurek v. Texas*, 428 U.S. 262, 272 (1976), the Supreme Court, noting that the terms in this special issue had not yet been defined, nevertheless upheld its constitutionality.  To have upheld the constitutionality of the special issue in such circumstances, the Supreme Court would necessarily have had to consider the ordinary connotations of the terms; accordingly, the State court's finding in the present case that the terms did not require further definition is neither contrary to, nor an unreasonable application of the Supreme Court's ruling in *Jurek*.  The Court will grant the Director's motion for summary judgment as to Summers' final sub-claim.

32

Because the Court will finds that the Director is entitled to summary judgment as to all four of the sub-claims of Summers' jury instructions claim, it will grant her motion for summary judgment as to the entire claim.

*Psychiatric Testimony Claim*

Dr. James Grigson, a psychiatrist, opined that there was no doubt that Summers would be a danger in the future.  Summers' sixth claim is that Grigson's testimony was false in three respects: Dr. Grigson overstated the number of defendants he had examined, overstated the number of defendants whom he had testified were not likely to be dangerous in the future, and overstated the degree of medical certainty he could reasonably had as to the likelihood that Summers would be dangerous to society in the future.   To establish a violation of the due process clause based upon the government's use of false or misleading testimony, the defendant must show (1) that the witness' statements were actually false, (2) that the testimony was material, and (3) that the prosecution knew that the witness' testimony was actually false. *Fuller v. Johnson,* 114 F.3d 491, 496 (5th Cir.), *cert. denied,* 522 U.S. 963 (1997), *citing Giglio v. United States,* 405 U.S. 150, 153-54 (1972).

The State court rejected Summers' claim, determining that he did not establish any of the elements of the *Fuller* test.  Specifically, the State court stated that Summers did not show by clear and convincing evidence that Dr. Grison's testimony was false, found that the prosecution had no actual or constructive knowledge that Dr. Grigson's testimony was actually false, and concluded that Dr. Grigson's testimony was not material.

33

The State court's first finding was based upon an incorrect standard of proof; the correct standard was preponderance of the evidence, not clear and convincing evidence. To prevail on this claim, therefore, Summers must establish the first element by a preponderance of the evidence, rebut by clear and convincing evidence the State court's finding as to the second element, see 28 U.S.C. §2254(e)(1), and establish that the State court's conclusion as to the third element was unreasonable. *See Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir. 2002), *cert. denied,* 123 S.Ct 963 (2003).

As to the first element of the *Fuller* test, the Court finds by a preponderance of the evidence that Grigson's testimony was false in three respects: he exaggerated the number of capital murder defendants he had examined, he inflated the number of defendants he determined would not be likely to be dangerous in the future, and he exaggerated the degree of his certainty that Summers would be dangerous in the future. *See* Petition at p. 137 and Appendix exhibit T. The Court also finds that Grigson's inflating the number of defendants he determined would not likely be dangerous in the future was a conscious attempt to mislead the jury as to his objectivity. As to the second element, the Court finds Summers has rebutted by clear and convincing evidence the State court's finding that the prosecution did not have actual knowledge that Dr. Grigson routinely exaggerated both his objectivity and the degree of medical certainty with which he could make  his predictions of future dangerousness. Summers contends that prosecution knew that Dr. Grigson exaggerated his certainty as to the likelihood that Summers would be a future danger to society, and overstated the number of defendants he had found not to be dangerous in the future.  Summers points out that the Taylor County District Attorney's office's usual practice was to use another psychiatrist along with Dr. Grigson, and that, in a trial

34

two years earlier, the other psychiatrist admitted on cross-examination that Grigson almost

without exception testifies in every case that the defendant is the worst type of sociopath he

(Grigson) has ever seen, and that in predicting the likelihood of the defendant being dangerous to

society in the future, Dr. Grigson's testimony is that on a scale of one to ten, the likelihood as to

every defendant is more than ten. [16]

As to the third element of the *Fuller* test, however, the Court finds that the State court's

conclusion that Dr. Grigson's testimony was not material was reasonable.  The test for

materiality in this context is whether there is any reasonable likelihood that the false and/or

misleading testimony could have affected the jury's verdict. *United States v. Bailey*, 473 U.S.

667, 679 n.9 (1985).   In the present case, there are three reasons why the exaggerations in Dr.

Grigson's testimony would not have affected the jury's verdict.   First, the prosecution presented

considerable evidence supporting a finding of future dangerousness including the facts of the

offense, Summers' criminal record and his violence toward his wife and a former girlfriend.

Second, on rebuttal the prosecution presented the expert testimony of Dr. E. Clay Griffith,

another psychiatrist, which was substantially identical to Dr. Grigson's testimony.   Finally, as to

Dr. Grigson's prediction, Summers presented contrary expert testimony to the effect that future

dangerousness cannot be predicted that accurately.   Because of this, it would not have been

unreasonable for the State court to deny this claim on the grounds that there was not any

---

[16]  While this evidence is not overwhelming, the Court notes that the State has never taken the position that the
prosecutors in fact did not know of Dr. Grigson's tendency to exaggerate; it has instead contended merely that Summers has not
been able to prove that the prosecutors did know this. See SHE Vol. II pp 33-44. In the absence of any evidence (such as an
affidavit by the prosecutors) that they did not know of Grigson's tendencies, the finding by the State court is not supported by the
record. The evidence offered by Summers is sufficient to clearly and convincingly rebut an unsupported finding. This evidence
does not, however, establish that the prosecution knew of the "Kine Letter." Summers' sub-claim that the prosecution should
have disclosed this letter to the defense fails for that reason.

reasonable likelihood that Dr. Grigson's exaggerating the number of defendants he has examined

and the number of defendants he predicted would not likely be dangerous in the future affected

the jury's verdict on the future dangerousness special issue. *Compare Hernandez v. Johnson,*

213 F.3d 243, 253 (5th Cir.), *cert. denied,* 531 U.S. 966 (2000). The Court will grant the

Director's motion for summary judgment as to this claim.

### Juror challenge claims

Summers' next claim contains two sub-claims. His first sub-claim is that the court erred

in granting the prosecutions' challenge for cause of Ms. Boast, a venire person who expressed

reservations about imposing the death penalty. In *Wainwright v. With,* 469 U.S. 412, 420 (1985),

the Supreme Court held that it was reversible error for a court to excuse for cause jurors who had

personal objections to the death penalty, if those beliefs would not prevent or substantially impair

the performance of their duties as jurors in accordance with their instructions and their oath. In

reviewing a trial court's determination of whether a juror's beliefs would prevent or substantially

impair his performance as a juror, a federal district court must give considerable deference to the

trial judge:

> . . . determinations of juror bias cannot be reduced to question-and- answer
> sessions which obtain results in the manner of a catechism. What common
> sense should have realized experience has proved: many venire men simply
> cannot be asked enough questions to reach the point where their bias has been
> made "unmistakably clear"; these venire men may not know how they will
> react when faced with imposing the death sentence, or may be unable to
> articulate, or may wish to hide their true feelings. Despite this lack of clarity
> in the written record, however, there will be situations where the trial judge is
> left with the definite impression that a prospective juror would be unable to
> faithfully and impartially apply the law. . . [This is why deference must be
> paid to the trial judge who sees and hears the juror.

*Id.* at 424-26. The Court in With held that a trial court's grant of a motion to excuse for cause

36

would be treated as a finding of fact by the trial court that the venire person's ability to follow the law was substantially impaired.  Under 28 U.S.C. §2254, this finding is presumed correct.  In order to obtain relief, therefore, Summers would have to demonstrate by clear and convincing evidence that the venire person's ability to follow the law was unimpaired by her beliefs.

Having reviewed the voir dire of Ms. Boast, the Court finds that the evidence that she was not impaired is less than clear and convincing.  In her questionnaire, in response to the question whether she had any moral, religious or personal beliefs that would prevent her from sitting in judgment of another human being, Ms. Boast answered with a question mark.  Asked to explain the answer, she stated that she meant  "I'm not sure.  I mean, I would have a hard time - - I think I'd have a hard time accepting that I sat in someone's death.  I guess that's why I put a question mark."  Asked whether she could follow the law in this case, she answered, "I guess so."  In response to a question whether she agreed or disagreed with the statement "Execution of criminals is a disgrace to civilized society", answered "agree", and explained her answer as " I'm not quite sure.  I guess – I don't know.  I guess if we were more civilized, we would have a better way of handling our criminals", but again stated that she guessed she could follow the law.

During questioning by the prosecutor, she answered most of the questions with "I guess so," but expressed strong reservations about answering the second special punishment issue.  Although not invariably against capital punishment in the abstract, Ms. Boast was very uneasy with the notion that answering that issue required her to predict whether there was a probability that the defendant would be dangerous in the future.  In response to a hypothetical, she stated that she guessed she could vote yes on the future dangerousness issue, but expressed fear that, after execution, she would learn about other evidence that would show that the defendant did not pose

a threat to society in the future, but that by then it would be too late, so she later stated that, in response to that same hypothetical: "I would probably still say 'no' just to go for life, in case I was wrong."

Ms. Boast then gave consistent answers on later questioning by the trial judge:

Q. . . . Would your feelings toward the death penalty, would they prevent you, or substantially affect your ability to answer these questions?

A. I would say that it would number two.

Tr. Vol. XI, pp. 2020-2050.

The record reveals that while Ms. Boast thought that capital punishment was uncivilized, her reservations about applying the law in a particular case sprang not from her feelings about the punishment itself, but rather from her own modesty as to her ability to predict the future dangerousness of a defendant. Such modesty is both well-founded and commendable, but the trial judge in this case could reasonably have determined from Ms. Boast's answers that there were no circumstances under which she could be convinced beyond a reasonable doubt that there was a probability that a defendant would commit acts of criminal violence in the future, both because of the speculative nature of such a prediction and because of her belief that new evidence relevant to that issue could surface later. The Court holds that the inability to be convinced beyond a reasonable doubt of a material issue, regardless of the evidence presented, is the inability to faithfully apply the law.

The record also reveals that the venire person's inability to faithfully apply the law was due to her recognition of the inherent difficulty of predicting future dangerousness, coupled with a recognition of the irrevocability of capital punishment, and of the possibility that not all relevant evidence would necessarily be presented before execution. This is rather different than

38

an objection to punishing offenders by death.  The Court holds, however, that a lack of

confidence in the criteria to be applied in determining whether the death penalty is imposed, as

well as a lack of trust in the judicial process' ability to present all of the relevant evidence before

an execution takes place, are sufficiently related to capital punishment in general that the

inability to impartially apply the law for these reasons should be construed as the inability to

impartially apply the law because of one's feelings about "the death penalty."

In excusing Ms. Boast for cause, the trial court stated that " . . . her feelings against the

death penalty are strong enough that she ultimately just wasn't going to be able to handle that

issue."  The Court finds that Summers has not rebutted, by clear and convincing evidence, the

presumption of correctness that attached to the trial court's finding that Ms. Bost's personal

feelings about the death penalty substantially impaired her ability to faithfully and impartially

apply the law was erroneous.  The Court will grant  summary judgment as to this sub-claim.

Summers' second sub-claim is that the trial court denied him the right to the due process

of law and to the equal protection of the law when it granted the prosecution's peremptory

challenge of a black venire person ("Mathis").

Prosecutors may not use peremptory challenges in a racially discriminatory manner.

*Batson v. Kentucky*, 476 U.S. 79, ____ (1986).  If the defense claims that a venire person has

been peremptorily challenged on the basis of race, it must establish a *prima-facie* case of

discrimination; the prosecution then has the burden of articulating race-neutral grounds for the

challenge.  If it does so, the defense has the burden of establishing that the proffered reasons are a

pretext for discrimination.  *Id*. at ____ .   In the present case, there is no issue as to whether the

defendant established a *prima facie* case of discrimination.  The prosecution articulated four

39

race-neutral reasons for peremptorily challenging Mathis: (1) She was, in her own words "wishy-washy" about whether she believed in the death penalty; (2) She answered "no" to the juror questionnaire question asking whether she believed in the death penalty; (3) her husband had been in the penitentiary, and (4) she had written "some hot checks."

Both the trial court and the Texas Court of Criminal Appeals found that these reasons were not pretextural. This is a finding of fact, see *United States v. Kelly,* 140 F.3d 596, 606 (5th Cir.), *cert. denied,* 525 U.S. 908 (1998), which is presumed correct.  To prevail on this sub-claim, Summers must rebut the presumption by clear and convincing evidence.  See 28 U.S.C. §2254 (e)(1).[17]

A comparative analysis of jurors struck and those remaining is a well-established tool for determining whether facially race-neutral reasons are actually a pretext for discrimination. Courts find pretext when the characteristics articulated in support of a peremptory challenge of a potential juror of one race are also present in a potential jurors of another race who are not challenged.  *See, e.g., United States v. Chinchilla,* 874 F.2d 695, 698-99 (9th Cir. 1989).

The first two reasons articulated by the prosecution actually collapse to a single reason, which the Court will label "lack of enthusiasm for the death penalty."[18]  The prosecution thus articulated three reasons for striking venire person Mathis: she exhibited a lack of enthusiasm for the death penalty, her estranged husband had served time in prison, and she had  recently had

---

[17] The Court notes that Summers' contention that the Texas Court of Criminal Appeals improperly analysed his argument on this point in its opinion on his direct appeal is correct.  Under 28 U S C. §2254, a federal district court may grant relief only if the decision reached by the state court is unreasonable, not if the decision is correct but the reasoning supporting it is faulty.  *See Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *cert. denied,* 123 S.Ct. 963 (2003 ).

[18] Though race neutral, this reason is problematic for other reasons.  *See Brown v. Rice,* 693 F.Supp. 381, 389-94 (W.D.N.C. 1988), *rev'd, Brown v. Dixon,* 891 F.2d 490 (4th Cir. 1989).

checks returned to her for insufficient funds.  The Court will review the venire in light of these three characteristics.

The parties have cited eleven white venirepersons who all exhibited a lack of enthusiasm for the death penalty.  As discussed above, the prosecution challenged one (Bost) for cause.  Summers cited five (Baty, Reed, Goble, Gramm and Thomas) who were not challenged at all, while the Director cited five  (Covey, Elzy, Veach, Jensen and Justice) who were peremptorily challenged by the prosecution.  The parties have also cited two white venirepersons who had family members serve time in prison.  Summers cited one (Goble) whose son served time for robbery but was not challenged, while the Director cited one (Justice) whose sister was incarcerated for writing bad checks and was peremptorily challenged.  The parties did not cite to any white venire person who believed, as venire person Mathis did, that they may be subject to criminal prosecution.

Two venirepersons, Goble and Justice, exhibited a lack of enthusiasm for the death penalty and had a family member who served time in prison.  The prosecution peremptorily challenged Justice but did not challenge Goble.  In no white venire person were all three characteristics present, as they were with venire person Mathis.

Summarizing this evidence, it appears that the prosecution exercised peremptory challenges on white venirepersons approximately 50% of the time when one of the three characteristics at issue was present, 50% of the time when two of the three characteristics was present, and did not confront a white venire person who exhibited all three characteristics.  These statistics do not constitute clear and convincing evidence that the three characteristics articulated by the prosecution were a pretext for discrimination.  Because the presumption of

41

correctness of the State courts' finding that the reasons were not pretextural has not been rebutted, the Court finds that the Texas Court of Criminal Appeals' denial of this claim was based upon a determination of fact which was reasonable in light of the evidence presented.  See 28 U.S.C. §2254 (d)(2).  The Court will grant the Director's motion for summary judgment as to this sub-claim.

*Ineffective assistance of counsel claim*

Summers' eighth claim is that his trial counsel provided ineffective assistance.  His claim contains six sub-claims.  To prevail on this type of claim, an applicant must establish both that his counsel's performance was deficient and that, has his counsel performed adequately, there is a reasonable probability that the result of his trial would have been different.  *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  The Court presumes that counsel acted reasonably. *Id.*

Summers' first sub-claim is that his counsel performed deficiently by not exhausting his peremptory challenges.  Summers contends that the trial court erroneously denied his challenge for cause of venire person Goble, but, because counsel did not exhaust his peremptory challenges, he waived his chance to appeal the trial court's ruling.  The Court generally agrees with Summers' contention that, if a venire person appears so biased that counsel can raise a good-faith, reasonable argument that she be removed for cause, and if such challenge is denied, counsel should either exercise a peremptory challenge on that venire person or at least, use up the allotted peremptory challenges so that the defendant can later appeal the denial for cause.

Assuming *arguendo* that counsel's failure to either peremptorily challenge venire person Goble or exhaust his allotment of peremptory challenges constituted deficient performance, the remaining issue is whether there is a reasonable probability that, had counsel taken either course, the result in the proceedings would have been different.  Summers does not contend that the result in his trial would have been different had juror Goble been excused, nor does he contend that, had he been able to appeal the trial court's denial of his challenge for cause, the Texas Court of Criminal Appeals would have reversed his conviction. In addition, because the Texas Court of Criminal Appeals found that Goble was not an unacceptable juror, it is clear that an appeal would have been unsuccessful, and because all of the unchallenged jurors were persuaded as to the correctness of Summers' guilt and sentence, there does not appear to be a reasonable probability that, had a different venire person served on the jury, the jury would have reached a different result.  Because Summers cannot establish the prejudice prong of the *Strickland v. Washington* test, the Court will grant the Director's motion for summary judgment as to this sub-claim.

Summers' second sub-claim is that defense counsel failed to object to the prosecution's challenges for cause, and failed to attempt to rehabilitate two venirepersons who expressed an unwillingness or inability to impose the death penalty.[19] This claim was denied by the Texas

---

[19] The voir dire of these two venire persons, in relevant part, was as follows:

Q.   One the jury is picked, once the evidence is presented, we're going to ask that jury to return a verdict of capital murder And if that jury returns that verdict, we'll then ask that same jury to sentence this man right here to death Let me ask you, could you ever, under any circumstances, return a verdict that assessed the death penalty?

A.   I don't belive I could, no.

*   *   *   *   *   *   *   *   *

Q.   . . . and because–because of that reality, you don't feel that there would be any circumstances that you would be able to, uh, follow the legal instructions that the Court gives you, knowing that if–if those two questions were answered

Court of Criminal Appeals, which held that "[t]rial counsel is not required to attempt to rehabilitate, or object to a challenge from the State when he reasonably believes that to do so would be unproductive." This standard appears consistent with the standard set forth by the United States Court of Appeals for the Fifth Circuit. *See Williams v. Collins,* 16 F.3d 626, 633 (5th Cir.), *cert. denied,* 512 U.S. 1289 (1994). The Court presumes that counsel failed to object to the excusal for cause of the two venirepersons, and failed to attempt to rehabilitate them, because he believed that doing so would be futile. The Court also presumes that counsel's beliefs were reasonable; Summers has failed to produce any evidence to rebut this presumption. Accordingly, the Court finds that Summers has failed to establish the first prong of the *Strickland* ineffective assistance of counsel test, and it is  unnecessary for the Court to analyze whether he can establish the second prong. The Court will grant the Director's motion for summary judgment as to this sub-claim.

Summers' third sub-claim is that his counsel failed to insure that bench conferences which occurred during his trial were recorded, which deprived him of the opportunity to have the rulings made during these conferences reviewed on appeal. The Texas Court of Criminal Appeals found on direct appeal that Summers had failed to meet the second prong of the *Strickland* test, because he did not explain with specificity why, had counsel made sure that a record was made of the bench conferences, there was a reasonable probability that the result in his case would have been different. The issue for the Court is whether this finding was

---

"yes," that–that the death penalty would be result?

A.      I don't . . . on a religous basis alone, on my belief that has changed somewhat from that time until now, I don't think that God would–would—would allow me to do that.  I just don't think I could do it.

44

reasonable. *See Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002)(*en banc*), *cert. denied*, ___ U.S. ___, 123 S.Ct. 963 (2003).

In his application to this court, Summers contends that he was prejudiced in two ways: "[First,] following several of these conferences, evidence was admitted by the State without any recorded objection by defense counsel. [Second], [f]ollowing others, the State was allowed to get into objectionable lines of questioning without recorded objection." Pet. at 178. Because Summers does not set forth what evidence was admitted and what lines of questioning the State was allowed to "get into," and because Summers does not explain why the evidence or lines of questioning were inadmissible or objectionable, the Court finds that the State court's denial of this sub-claim was reasonable. *Cf. Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998) *cert. denied*, 525 U.S. 1174 (1999) (conclusory allegations of prejudice will not establish the second prong of the *Strickland* test in claim that counsel failed to preserve record of bench conferences.) The Court will grant the Director's motion for summary judgment as to this sub-claim.[20]

Summers' fourth, fifth, sixth and seventh sub-claims are that his trial counsel provided ineffective assistance by failing to preserve error after objecting to several trial court rulings admitting harmful evidence, by failing to object to the admission of harmful hearsay evidence, by failing to object to the admission of harmful physical evidence, and by failing to adequately cross-examine several witnesses. The Texas Court of Criminal Appeals dismissed these claims on the ground that Summers' appellate brief in chief failed to comply with Tex. R. App. Proc.

---

[20] Summers also argued that "numerous cases have held that defendant's (sic) are entitled to a new trial where all or part of the record is missing, lost, or destroyed through no fault of the defendant" citing *inter alia Payne v. State*, 802 S.W.2d 686, 689 (Tex. Crim. App. 1999). *Payne* held, however that a defendant is entitled to a new trial where omissions in the record were not caused by negligence on his *or his counsel's part*. In the present case, Summers' claim is essentially that the record was incomplete due to the negligence of his counsel.

210 (b) and 74(f).[21]  If a state court dismisses claims on "adequate and independent" state grounds, they cannot be reviewed in federal *habeas corpus*. *Coleman v. Thompson*, 501 U.S. 722, 748 (1991).  To be "adequate and independent" a state's procedural bar must not rely on federal law, must be strictly, regularly and evenhandedly applied, and must have been clear at the time the state appeal was filed. *See generally Johnson v. Cain*, 215 F.3d 489,494 (5th Cir. 2000).

State rules of appellate procedure are presumed to be adequate and independent, and the burden of rebutting that presumption is on the petitioner. *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999), *cert. denied,* 528 U.S. 1145 (2000).  In the present case, Summers has not even alleged, must lest established, that the rules upon which the Texas Court of Criminal Appeals dismissed his fourth and fifth sub-claims were not adequate or independent.[22]  Accordingly, the Court finds that these three sub-claims are barred from review.  The Court will grant the Director's motion for summary judgment as to these sub-claims.

Summers' eighth sub-claim has two parts.  He first contends that his counsel provided ineffective assistance by not requesting that the trial court give the jury instructions on lesser included offenses at the guilt determination phase of his trail.  He then contends that his counsel provided ineffective assistance by not moving for a directed verdict of life imprisonment at the close of the punishment phase of his trial.

---

[21] These rules were recodified in 1997 as Rule Nos. 71.3 and 38 respectively  The rules provide in relevant part that the briefs must contain a clear and concise argument for each contention made.  In stating that Summers' arguments were "wholly  conclusory," the Texas Court of Criminal Appeals appears to have found that Summers violated this directive by not explaining how the several instances of attorney negligence of which he complained prejudiced his case, as is required under *Strickland.*

[22] Summers did not address the procedural default issue. Instead, he asserted, incorrectly, that these four sub-claims had been denied on the merits by the Texas Court of Criminal Appeals.

46

Regarding his first contention, the Court agrees with Summers' implicit proposition that, in general, counsel in capital cases should seek to have lesser included offense instructions given to the jury. Assuming *arguendo* that counsel's failure to request such instructions constitutes deficient performance, [23] the remaining issue under *Strickland* is whether, had counsel requested such instructions, there is a reasonable probability that the trial court would have granted the request and whether, if the trial court gave such instructions, there is a reasonable probability that the result at the guilt determination phase of Summers' trial would have been different.

In his petition, Summers never contends, much less explains why, there is a reasonable probability that the trial court would have granted his request for a lesser-included offense instruction. Similarly, he neither contends, nor explains why, had the lesser included offense instruction been given, there is a reasonable probability that the result in the guilt determination phase of his trial would have been different. Because Summers does not establish the prejudice prong of the *Strickland* test, the Court will grant the Director's motion for summary judgment as to this part of his eighth sub-claim.

Summers' second contention is that his counsel's failure to move for a directed verdict at the close of the punishment determination phase of his trial denied him the right to appeal the issue of whether there was sufficient evidence to support the jury's finding that there was a reasonable probability that he would be dangerous in the future. Summers is correct that, as a general matter, a defendant who fails to make a motion for a directed verdict at the end of his case forfeits the right to raise on appeal the insufficiency of the evidence to support his

---

[23] This assumption finds no support in authority, although the reasons provided for not adopting it are unpersuasive. *See e.g. United States v. Hall, 843 F.2d 408, 413 (10yh Cir. 1988); U.S. v. Washington,* 840 F.Supp. 562, 574 (N.D. Ill. 1993), *aff'd* 65 F.3d 170(7th Cir. 1995).

conviction. *See United States v. Anderson*, 108 F.3d 478, 480 93d Cir. 1991).  In the present

case, however, the Texas Court of Criminal Appeals did reach the merits of Summers'

insufficiency of the evidence claim, despite his counsel's failure to preserve the error for review.

*See Summers v. State*, Nos. 71,389 and 71, 138 (Tex. Crim. App. June 8, 1994) Slip Op. at 6-7.

Because Summers in fact received an appellate ruling on the merits of his sufficiency of evidence

claim, he cannot establish that his counsel's failure to move for a directed verdict caused him to

forfeit his right to appeal this issue.  The Court will grant the Director's motion for summary

judgment as to this part of Summers' eighth sub-claim> Because the Court will grant the

Director's motion for summary judgment as to all eight sub-claims in Summers' ineffective

assistance of counsel claim, it will grant the motion for summary judgment as to Summers' entire

eighth claim.

   *Insufficient evidence claim*

   Summers' ninth claim has two sub-claims.  The first sub-claim is that he was denied due

process of law because the evidence presented in the guilt determination phase of his trial was

insufficient to support his conviction.  The second is that his death sentence constitutes cruel and

unusual punishment because the evidence presented was insufficient to support the jury's finding

that there is a probability that he would commit acts of criminal violence which would constitute

a continuing threat to society.

   Regarding the first sub-claim, evidence is sufficient to support a conviction if , viewed in

the light most favorable to the prosecution, it demonstrates that a rational jury could have found

the accused guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 314-25 (1979).

Summers contends, and the Court assumes *arguendo*, that absent the out of court statements by

Andrew Cantu that Summers hired him to kill his parents and the testimony of William Spaulding that Summers had confessed to him that he had hired Cantu to kill his parents, a rational jury could not have found beyond a reasonable doubt that Summers was guilty of capital murder. Summers contends that this evidence should not have been admitted. The Court, however, has already found to the contrary. *See* pp. 6-12. Accordingly, the Court finds that Summers' conviction is supported by sufficient evidence.

Regarding his second sub-claim, the same general standard applies. If the evidence, viewed in the light most favorable to the prosecution, demonstrates that a rational jury could have found beyond a reasonable doubt the there was a probability that Summers would commit criminal acts of violence which would constitute a continuing threat to society, his death sentence would not constitute cruel and unusual punishment. *See Woods v. Cockrell,* 307 F.3d 353, 357 (5th Cir. 2002). Summers contended that, other than Darrell Shirlls' testimony that Summers had threatened a witness while in prison, there was insufficient evidence to support a finding beyond a reasonable doubt that there was a probability that he would be a danger to society in the future. Summers then argues that, because Shirlls was facing several felony indictments and had mental illness, his testimony was so lacking in credibility that it was insufficient to support his conviction.

The Texas Court of Criminal Appeals rejected this claim, finding that the evidence other than Shirlls' testimony was sufficient to support the jury's finding of future dangerousness. Pursuant to 28 U.S.C. §2254 (d)(1), the issue for the Court is whether this finding is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

49

The Court notes that the Texas Court of Criminal Appeals' finding does not appear objectively unreasonable, for the reasons set forth on pp. 19 and 24-25 of this memorandum opinion, but the Court chooses to deny this sub-claim on different grounds than those relied upon by the State court. Summers' argument fails because, in considering sufficiency of the evidence, a court does not consider issues of witness credibility. *See United States v. Turner*, 319 F.3d 716, 720 (5th Cir. 2003). As Summer's punishment sub-claim is based entirely on a premise that cannot constitute grounds for granting relief, the Court will grant the Director's motion for summary judgment as to his second sub-claim.

Because the Court will grant the Director's motion for summary judgment as to both sub-claims of Summers' insufficiency of evidence claim, it will grant the motion as to his entire ninth claim.

### *Constitutionality of capital punishment claim*

Summers' tenth and final claim is that the death penalty, as administered in Texas, constitutes cruel and unusual punishment. His claim has two sub-claims. First, he contends that providing death as a punishment offends contemporary standards of decency. Second, he contends that the Texas system, which attempts to limit the jury's discretion in choosing when to impose the penalty while simultaneously allowing the jury broad discretion to decide when not to impose the penalty, does not prevent irrelevant considerations, such as race and economic status, from having an impact in the decision of who receives the death penalty and who receives life imprisonment.

Because the Texas Court of Criminal Appeals rejected this claim on the merits, this Court's review is limited to determining whether the rejection was contrary to, or an

50

unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. *See* 28 U.S.C. §2254 (d)(1).  The Supreme Court, however, has upheld the constitutionality of both the death penalty in the abstract and the Texas death penalty procedure against the charges made by Summers.  *See McKleskey v. Kemp*, 481 U.S. 279, 300 (1987) (evolving standards of decency); *Johnson v. Texas*, 509 U.S. 350 (1993), (tension between limited and broad jury discretion.)  Because there is no Supreme Court precedent which directly or indirectly invalidates either Summers' sentence or the process by which it was imposed, the Court will grant the Director's motion for summary judgment as to both sub-claims of Summers' tenth claim.

### Conclusion

For the reasons set forth above, the Court will grant the Director's motion for summary judgment as to all of Summers' claims and deny his application for a writ of *habeas corpus*.  An order and judgment will be entered.

SIGNED this 4ᵗʰ day of *March*, 2004.


THAD HEARTFIELD
CHIEF UNITED STATES DISTRICT JUDGE